FILED
1/22/20 12:02 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| UNIQUE VENTURES GROUP, LLC, | : | Case No. 17-20526-TPA |
| *Debtor* | : | |
| | : | Chapter 11 |
| ALBERT'S CAPITAL SERVICES, | : | |
| LLC, as Plan Administrator, | : | Adversary. No.  19-02013-TPA |
| *Plaintiff* | : | |
| | : | Related to Doc. Nos. 1, 129, 132 |
| v. | : | |
| | : | |
| DAMON'S OF NORTH AMERICA, | : | |
| LLC, et al., | : | |
| *Defendants* | : | |

Appearances:  Ross M. Bobbitt, Esq., Counsel for Albert's Capital Services, LLC
Joseph Luvara, Esq., Counsel for Damon's North America LLC

## MEMORANDUM OPINION

This Adversary Proceeding presents the issue of which party is the rightful owner of

certain assets, which will be referred to hereinafter as the "Damon's Assets.[1]"  The contenders are

the Debtor, Unique Ventures Group, LLC ("Unique"), whose position here is being advocated by

its Plan Administrator, and Damon's of North America, LLC ("DNA").  Following a 2-day October

---

[1]

The Parties have stipulated that the "Damon's Assets" consist of "[t]he franchise, contract, and intellectual property rights" owned by the Debtor in the "Damon's" bankruptcy case filed at Case No. 09-27920-JAD (discussed further, *infra*).  *See*, Stipulation 1 and 2 as set forth in the *Joint Pretrial Statement*, Doc. No. 100.  The Court uses that term in this Opinion consistent with the Stipulation.

1

trial, the conclusion of post-trial filings and final argument, and for the reasons that will be set forth

below, the Court finds that all of the Damon's Assets are rightfully the property of the Unique

bankruptcy estate, and will issue a declaratory judgment order accordingly.[2]

## BACKGROUND

Prior to its bankruptcy filing Unique operated a group of Perkins Restaurants in

Western Pennsylvania and Ohio pursuant to franchise contracts it held with the "Perkins" franchisor,

Perkins & Marie Callendar's, LLC ("PMC"). Unique was a Pennsylvania limited liability company

whose original owners were the Sabatini Limited Partnership, Futures663, LLC, Jack Kuhn, and

Carl Baker. Unique was run by a board of directors.

In 2013 there was a bankruptcy case pending in this Court involving Damon's

International, Inc. and a number of other related entities. *See, Damon's International, Inc.*, Case No.

09-27920-JAD. The debtor in that case was also in the restaurant business, franchising various

individual restaurant locations under the "Damon's" name. Jeffrey J. Sikirica ("Sikirica") was

appointed to act as a Chapter 7 trustee in that case. In August 2013 Sikirica filed a motion in the

case seeking to sell substantially all of the remaining assets of that debtor. *See,* Doc. No. 1697 in

Case No. 09-27920.[3] An auction was held on September 24, 2013, and Unique was determined to

---

[2]

This is a core matter pursuant to *28 U.S.C. §§157(b)(2)(A), (E), (H)*, and *(O)*. The Court has jurisdiction over this matter pursuant to *28 U.S.C. §1334*. This *Memorandum Opinion* represents the Court's findings of fact and conclusions of law pursuant to *Fed.R.Bankr.P. 7052*.

[3]

Although not admitted into evidence in the current matter, the Court takes judicial notice of the relevant docket filings in Case No. 09-27920 pursuant to *F.R.E. 201*. *See, e.g., In Re Cyrilla*, Case No. 18-20017-GLT, Doc. No. 234 at n. 2 (January 7, 2020) (citing *U.S. Trustee v. Stone Fox Capital, LLC (In Re Stone Fox Chapel, LLC),* 572 B.R. 582, 592, n. 3 (Bankr. W.D. PA 2017).

be the high bidder, having submitted a bid in the amount of $825,000. *See*, Order of September 27, 2013, Doc. No. 1741 in Case No. 09-27920.

The bid of Unique was submitted by Jack Kuhn, who at the time was a member of and the "chairman" of the Unique board of directors. Some of the other Unique board members were unaware for several months thereafter that Kuhn had submitted a bid on behalf of Unique and been successful. When they found out what had happened, these same board members took the position that Kuhn lacked the authority to submit the bid on behalf of Unique and thereafter an attempt was made by Unique to stop the sale. Considerable efforts were expended in that regard, but they were ultimately unsuccessful.

On January 9, 2014, Sikirica filed an *Expedited Motion to Enforce Order Authorizing the Sale of Substantially All Remaining Assets Free and Clear of all Liens, Claims and Encumbrances and for Assumption and Assignment of Franchise Agreements* in the Damon's International bankruptcy. *See,* Doc. No. 1790 in Case No. 09-27920. On April 25, 2014, an order was entered by the Bankruptcy Court granting Sikirica's Motion and directing the sale to proceed and be consummated, although giving Unique some additional time to pay the balance of the required payment to Sikirica. *See*, Order of April 25, 2014, Doc. No. 1840 in Case No. 09-27920.

During the same period of time that Unique was unsuccessfully challenging its obligation to buy the Damon's Assets, other events were occurring. Michael Sabatini ("Sabatini"), a member of the Sabatini Limited Partnership and another board member of Unique, contacted an individual he knew who was affiliated with PMC to discuss the situation. At trial Sabatini testified that he did so because, based on a previous attempt by Unique to acquire some "Kings Restaurant"

3

locations he knew the PMC/Unique franchise agreements contained prohibitions that might negatively impact Unique's purchase of the Damon's Assets. Specifically, Sabatini was informed by the PMC representative he spoke with that PMC would not agree to such a purchase because it prohibited its franchisees from owning competing restaurants, and because Damon's restaurants sold alcohol unlike Perkins restaurants, which were billed as "family" restaurants that did not sell alcohol.

Finding itself in the dilemma of either proceeding with the purchase of the Damon's Assets from Sikirica that would likely result in a termination of their franchise agreements with PMC, or not proceeding with such sale and risk violating the bankruptcy court order directing it to do so, the Unique board sought the advice of the company's attorney, Ronald Conway ("Conway"). Conway suggested the creation of a new entity to receive the Damon's Assets as a means of forestalling any objection by PMC. Based on the trial testimony the Unique board members apparently agreed to such an approach, although no board meeting minutes or formal board resolution to that effect was introduced into evidence.

Prior to the creation of any such entity, however, Sikirica filed a *Report of Sale* on June 27, 2014 at Doc. No. 1865 in Case No. 09-27920. The *Report of Sale* stated that Unique had paid the required purchase price and it included as an exhibit a "Bill of Sale" dated June 27, 2014 showing that on that date Sikirica, as trustee for Damon's Restaurants. Inc., conveyed to "Unique ... or its assigns" all of his right, title and interest in various assets, including the following:

> ... intellectual property of any kind or nature, including, but not limited to e-mail addresses, e-mail inventory, web site or sites, registered copy rights or trademarks containing or referencing in

4

> whole or in part the name or designation of Damon or Damon's, all
> existing contracts ..., any other active or executory contracts ...

*Report of Sale*, Exhibit A.  In other words, all of the Damon's Assets were conveyed "as is, where

is" to Unique on June 27, 2014, pursuant to the bankruptcy court orders in Case No. 09-27920.

Also included as an exhibit to the *Report of Sale* was an "Assignment and

Assumption Agreement" dated June 27, 2014, signed by both Sikirica and by Kuhn as "Chairman

of the Board" of Unique, which included the following provisions:

> 1.   **Assignment of Assignor**.  Assignor [Sikirica] hereby sells,
> assigns, transfers, sets over and delivers to Assignee [Unique], its
> subsequent designee or assignee, all of Assignor's right, title and
> interest in and to all of Assignor's executory contracts set forth on
> Exhibit A attached hereto and made a part hereof (the "Contracts").
>
> . . .
>
> 3.   **Assignment of Trademarks**.  Assignor hereby sells, assigns,
> transfers, sets over and delivers to Assignee, its subsequent designee
> or assignee, all of Assignor's right, title and interest in any and all
> trademarks in which it has an interest, including but not limited to
> **DAMON'S (#1,241,615), DAMON'S THE PLACE FOR RIBS
> (#1,395,339), DAMON'S GRILL (#2,749,525) and GREAT
> FOOD, GAME DAY AND EVERYDAY (#3,410,152)**.  The
> Assignor, as part of and in consideration of the purchase, shall be
> responsible for the proper assignment and transfer of all such
> trademarks to the Assignee, its subsequent designee or assignee, by
> causing the perfection of the assignment and transfer to be registered
> in the United States Patent and Trademark Office within Thirty (30)
> days from the execution of this agreement.

*Report of Sale*, Exhibit B (emphasis in original).  Again, therefore, all of Sikirica's rights in all of

the Damon's Assets were clearly assigned to Unique on June 27, 2014.  It should also be noted that,

despite the language in Paragraph 3 of the Assignment and Assumption Agreement, nothing was

done within 30 days to record anything with the United States Patent and Trademark Office

("USPTO") to indicate that any of the registered Damon's trademarks as set forth therein had been

assigned to Unique or anyone else.   (The four trademarks identified in Paragraph 3 of the

Assignment and Assumption Agreement are a subset of the Damon's Assets and will be referred to

hereinafter as the "Damon's Trademarks").

DNA, was incorporated by Conway on July 14, 2014, more than two weeks after the

transfer of Damon's Assets to Unique.  DNA was incorporated  as a single-member Pennsylvania

limited liability company.  That single member was Michael Rusnock.

Michael Rusnock ("M. Rusnock") was a minority owner of Futures 663, LLC, and

was the son of Joseph Rusnock ("J. Rusnock"), who was one of the larger owners of Futures 663,

LLC, and  a board member of Unique.  M. Rusnock had been employed by Unique for a number of

years.  He started out in a position where he gathered documents, provided administrative help, and

provided technical support.  Eventually his position became that of a "legal liaison" for Unique

working closely with Conway.   In his various duties with Unique, M. Rusnock earned the

confidence of the Unique members and when DNA was created, it was decided to identify him as

the sole member of the new entity, but with the understanding that the real beneficial owners of the

new entity would be the board members of Unique. *See Trial Transcript*, 32:14 - 33:3, October 7,

2019 (Doc. No. 161).  M. Rusnock testified that Conway had referred to  his role at DNA as in effect

being a "trustee," but there was no written agreement to that effect.  *Id*. at 38:24-25.

After the creation of DNA there was never a documented assignment or transfer of

any of the Damon's Assets from Unique to DNA.  Additionally, DNA never made any sort of

payment to Unique for the Damon Assets. A draft of a promissory note from DNA to Unique was prepared by Conway at one point, and it apparently would have been at least in part in consideration for the Damon's Assets, among other things, but it was agreed by all the witnesses that it never went into effect. Despite the lack of any transfer or assignment, DNA's principal activity at that point was to engage in efforts to collect franchise fees from the restaurants that had franchise agreements that allowed them to use the "Damon's" name, which franchise agreements were part of the Damon's Assets.

On October 31, 2014, Sikirica executed a document entitled "Assignment of Trademarks," Defendant's Exhibit 4, that purported to assign the four Damon's Trademarks from Damon's Restaurants, Inc. to DNA. Although somewhat surprising given its importance to the case, the  record is not entirely clear on the question of the subsequent filing of the Assignment of Trademarks document with the USPTO. Nevertheless, the Court finds it to be sufficiently proven that the Assignment of Trademarks to DNA was subsequently  filed  with the USPTO such that DNA does appear to be the current record owner of the Damon's Trademarks. The Court notes, for instance, that Plaintiff's counsel referred at trial to "four trademarks that are registered in DNA's name." *Trial Transcript*, 86:16-17, October 8, 2019 (Doc. No. 162). *See also*, *Trial Transcript*, 23: 9-17, October 7, 2019 (Doc. No. 161). Furthermore, it is not uncommon for courts to take judicial notice pursuant to *F.R.E. 201* of filings with the USPTO that are available on the searchable "TESS" trademark database on the USPTO web site. *See, e.g., Foster v. Pitney Bowes Corp.*, 2013 WL 487196, fn 4 (E.D. Pa. February 8, 2013) (USPTO registration documents are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned). A review of the TESS records for the Damon's Trademarks shows that the Assignment

of Trademarks document was recorded with the USPTO on November 10, 2014.[4]  Unique filed its

bankruptcy petition on February 13, 2017, and the issue of which entity owns the Damon's Assets

– Unique or DNA – arose in due course.

The above sets forth the basic facts concerning the dispute between the Parties.  If

any additional factual details are required to address a particular legal issue they will be set forth as

part of the discussion below.

### *LEGAL DISCUSSION*

In its Amended Complaint Plaintiff advances three theories in support of its position

that the Court should find and declare that the Damon's Assets are property of the bankruptcy estate.

First, Plaintiff contends that all of the Damon's Assets were transferred to Unique on June 27, 2014,

and were never subsequently transferred to DNA, thus they are property of the bankruptcy estate

pursuant to *11 U.S.C. §541.*

Plaintiff's second theory is that even if there was an effective transfer of the Damon's

Assets to DNA, such transfer was an avoidable fraudulent transfer under *11 U.S.C. §544* and *12 Pa.*

*C.S.A. §5101, et seq.* because it was made either with an actual intent to hinder, delay or defraud

creditors, or it was made without Unique having received a reasonably equivalent value in exchange

---

[4]

The USPTO "TESS"  record also shows that DNA subsequently assigned the Damon's
Trademarks to an entity named Elite Restaurant Group, LP ("Elite") in September 2015, and then
Elite assigned them back to DNA in September 2016.  No evidence was presented at trial concerning
these events, but for present purposes the key takeaway from a review of the USPTO record is that
DNA is shown as the current registered owner of the Damon's Trademarks.

**when (a)** the Debtor was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction, or (b) the Debtor intended to incur or believed or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.  At trial the Court orally ruled that the Plaintiff failed to demonstrate an actual intent to hinder, delay or defraud creditors and that the evidence did not support a finding that Unique was insolvent at the relevant time in 2014 when DNA alleges the Damon's Assets were transferred to it.  Plaintiff has not included the fraudulent transfer argument in its post-trial briefing so the Court concludes it has waived this argument and need not discuss it any further.

The final theory advanced by Plaintiff is that DNA should be required to turn the property over pursuant to *11 U.S.C. §542* either because it was merely the "alter ego" of Unique and its  property  should be treated as the property of Unique, or because any attempted transfer of the Damon's assets to DNA was not legally effective.

The Court begins with Plaintiff's first argument that all of the Damon's Assets were transferred from Sikirica to Unique as of June 27, 2014, and were never subsequently transferred by Unique to DNA, or to anyone else, so they still reside in Unique.  In making this argument Unique relies strongly on some stipulations that the Parties entered into prior to trial:

> The franchise, contract, and intellectual property rights owned by Damon's as the franchisor of several operating restaurants were put up for sale at auction in the Damon's Bankruptcy (the "Damon's Assets").
>
> On June 27, 2014, the Damon's Bankruptcy trustee filed a Report of Sale of the Damon's Assets, attaching a Bill of Sale commemorating

the sale of the Damon's Assets to Unique in consideration for $825,000.

On June 27, 2014, the Damon's Bankruptcy trustee and Unique entered into an Assignment and Assumption Agreement which effected the transfer of rights and obligations under the Damon's Assets to Unique.

Stipulations 2, 6 and 7 of the Parties, *see Joint Pretrial Statement*, Doc. No. 100.

Stipulations are "formal concessions that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Christian Legal Soc. Chapter of the University of California Hastings College of Law v. Martinez*, 561 U.S. 661, 677-78 (2010). *See also, W.D. Rubright Co. v. International Harvester Co.*, 358 F. Supp. 1388 (W.D. Pa. 1973) (a stipulation serves as a surrogate for a finding of fact made during the trial). Based on the Stipulations of the Parties here, it is therefore undisputed that as of June 27, 2014, all of the Damon's Assets, including the Damon's Trademarks, became the property of Unique. The question then becomes whether those assets ever subsequently became the property of DNA, an entity that was not even in existence until a few weeks later. M. Rusnock admitted at trial that he was not aware of any agreement by which Unique ever transferred any assets to DNA. *Trial Transcript*, 50:11-25, October 7, 2019 (Doc. No. 161).

Conway, who as noted earlier was acting as general counsel for Unique during the relevant time period, testified as follows on cross-examination:

Q.     Is there an assignment, conveyance license or contract or any other legal document between, or agreement between Unique and Damon's North America by which Unique transferred or assigned any of the Damon's assets to Damon's North America?

10

A.    There's a Board resolution. I didn't do the minutes of the meetings, so that other than that Board resolution, I  don't know of any other transfer other than what's set forth  at the Trademark Office where they transferred the assets of Damon's International to Damon's of North America.

*Trial Transcript*, 112:21 to 113:4, October 8, 2019 (Doc. No. 162).

It is thus clear that there was never any sort of stand-alone written document, or even oral assignment, by which Unique ever transferred any of the Damon's Assets to DNA following Unique's acquisition of those same assets on June 27, 2014.  The only other potential "vehicles" by which an assignment or transfer from Unique to DNA could have occurred based on the evidence presented at trial was a purported Unique board resolution as referred to in the Conway testimony quoted immediately above, or the Assignment of Trademarks document executed by Sikirica on October 31, 2014,and then filed with the USPTO on November 10, 2014, also mentioned by Conway.  The Court must therefore consider whether either of those effected an assignment or transfer of any of the Damon's Assets to DNA.

The purported Unique board resolution as a means of assignment or transfer is highly problematic in a number of respects.  In the first place, no  writing memorializing the existence of such a resolution – whether the resolution itself, or the minutes of the meeting at which it was supposedly adopted – was introduced into evidence.  The only evidence presented of any board action was testimony by Sabatini and Conway, and it was not entirely consistent.  For instance, from Sabatini's testimony it is unclear whether the board meeting in question is supposed to have occurred in January of 2014, *Trial Transcript*, 14:23 to 15:7, 19:9-14, October 8, 2019 (Doc. No. 162), or in May or June of 2014, *Trial Transcript*, 100:14-24, October 7, 2019 (Doc. No. 161).

11

Conway's testimony placed the board meeting in January 2014, *Trial Transcript*, 56:9-15, October 8, 2019 (Doc. No. 162), so it seems likely that is the correct date of the board meeting in question, and the Court so finds.

Secondly, the testimony was also vague as to exactly what the Unique board was supposed to have done at this meeting. For example, the following exchange occurred during the cross-examination of Conway:

> Q.    None of the Damon's assets were transferred from Unique Ventures Group to Damon's North America, were they, sir?
>
> A.    I don't know if you – if I understand the word transfer. There was a Board meeting that Unique, see if I can phrase this correctly for you, that Unique did not want to own any of the assets of Damon's International and that they authorized those assets to be placed in Damon's North America. Whether you call that a transfer or not, I don't know.

*Trial Transcript*, 112:12-20, October 8, 2019 (Doc. No. 162). Sabatini explained his understanding of what the Unique board did as follows:

> A.    ... In that, in the first meeting we basically said that we could not own it and we were transferring it from Unique to DNA. We – it was never supposed to touch Unique but the ownership interest, the investment was being transferred. We had plenty of capital to do that. We had plenty of business reason to do that. And there's absolutely nothing wrong with doing that.

*Trial Transcript*, 100:17-23, October 7, 2019 (Doc. No. 161). At most, the board was thus expressing an intent, or giving its authorization, to have the Damon's Assets transferred into DNA at some point in the future. What the board did as related in the above quotations could not have

effected a present assignment to DNA for two simple reasons: DNA had not yet been created at the time the board meeting occurred, and the Damon's Assets had not yet been transferred to Unique.[5]

In short, even assuming that the Unique board adopted a resolution as the witnesses described, some additional future act would have been necessary to actually carry it out, either by creating DNA before the transfer from Sikirica and directing him to transfer the assets directly to DNA in the first instance, or by having Unique make a subsequent assignment to DNA following its June 27, 2014 acquisition of the Damon's Assets. Neither of those things happened. In this respect, the situation here was similar to *Three Rivers Confections, LLC v. Warman*, 660 F. App'x 103 (3d Cir. 2016). In that case the ownership of a trademark was at issue and one of the competing parties, Warman, argued that the trademark had been assigned to him, relying in support on a declaration filed by one Falvo, the CEO of the former owner. As the court stated in its opinion finding against Warman:

> Falvo stated in her declaration that she had emailed corporate counsel to transfer ownership of the Fudgetopia trademark to Warman. In the email, which was made part of the record, Falvo merely advised counsel that she "would like to transfer the ownership of the trademarks for Fudgetopia" to Warman. There is no evidence to suggest that any steps were taken, beyond this email, to effectuate the transfer of the trademark.

---

[5]

Unique could have assigned its contractual right to purchase the Damon's Assets to another entity (its "subsequent designee or assignee" as seemingly contemplated in the Assignment and Assumption Agreement) even before the June 27, 2014 asset transaction occurred, something frequently seen in bankruptcy-related sales, but there was no evidence that it ever did so. Also, if that was Unique's intent, that entity had to be *sui generis* at the time of the alleged transfer – which it was not – therefore no entity other than Unique existed to receive title to the assets being transferred by Sikirica.

660 F. App'x at 109. Accepting as true the evidence presented by DNA in the present case, this is analogous to what happened here. The Unique board may have expressed an intent to transfer the Damon's Assets to DNA, and may even have instructed its counsel to take steps to do so, but nothing more was ever done to effectuate such transfer.[6]  In the same vein, *see also, e.g., UBU/Elements, Inc. v. Elements Personal Care, Inc.*, 2016 WL 3418696 *3 (E.D. Pa. June 21, 2016) (an agreement to assign a mark in the future is not a present assignment and does not vest legal title at the time of the agreement; court was convinced that while defendants may have promised to assign a mark, there was insufficient evidence to show that promise was fulfilled and assignment was executed).

DNA also argued that Unique never had the power to take ownership of the Damon's Assets because the Unique board's "resolution" denied it such power. *See, e.g.*, *Trial Transcript*, 15:25 to 16:23, October 8, 2019 (Doc. No. 162). Again, without the actual wording of a board resolution, or at least minutes from the meeting, it is hard to credit this sort of vague oral testimony given some 5½ years after the fact. If the Court disregards that evidentiary infirmity and assumes that the purported board resolution did include some sort of explicit negation of the power of Unique to accept the Damon's Assets, it would still have to conclude that such a provision was ineffective to prevent Unique from having become the owner of those assets as of June 27, 2014, for purposes of the present litigation. That is so for four reasons.

---

[6] The failure to take any action to effectuate a transfer to DNA also calls into question whether the Unique board ever even intended a "real" transfer to DNA. As discussed above, the overriding concern all along was to avoid any problem with PMC related to the Damon's Assets. It appears that once such potential problem was successfully avoided that concern had been address and there may have been no need to carry through with an actual transfer to DNA.

First, Unique made an attempt to "get out" of its obligation to buy the Damon's

Assets following Kuhn's successful bid, but the Bankruptcy Court rejected that effort, finding that

Unique was bound by its bid. Therefore, Unique's hands were tied; it had to complete the

transaction and a resolution by the Unique board to the effect that Unique did not have the power

to accept the Damon's Assets would be an improper and ineffective attempt to nullify the

Bankruptcy Court order.

Second, both the Bill of Sale and the Assignment and Assumption Agreement recite

that a transfer <u>was</u> made to Unique, and in fact the latter document includes the signature of Kuhn,

who is identified as the "Chairman of the Board" of Unique.

Third, any argument that Unique lacked the power to have assumed ownership of

the Damon Assets as of June 27, 2014, as a result of some action by the Unique board is contradicted

by Stipulations 2, 6, and 7, which DNA freely agreed to, and it must therefore be rejected.

Fourth, and finally, the "Asset Purchase Agreement" for the Damon's Assets that

Kuhn signed on behalf of Unique as chairman of its board includes various representation and

warranty provisions attesting to the power of Unique to acquire the Damon's Assets. *See*, the Order

of September 27, 2013 in Case No. 09-27920 authorizing the sale to Unique, Doc. No. 1741, which

includes the signed Asset Purchase Agreement as an attachment. Among the relevant provisions in

that document are Articles 7.1 (Unique has all requisite power and authority to consummate the

transactions contemplated hereby), 7.2 (Unique has taken all necessary limited liability company

action to authorize the performance by it of all terms and conditions and consummation of its

15

transaction as contemplated hereby), and 7.3 (consummation of the transactions contemplated hereby will not violate any provision of the organizational document of Unique). Any after-the-fact attempt by the Unique board which would have had the effect of negating these representations and warranties would have required approval of the bankruptcy court because it would have in effect been an attempt to modify the September 27, 2013 Order.[7] No such bankruptcy court approval was ever sought or obtained by Unique.

The Court thus concludes that nothing done by the Unique board prevented Unique from acquiring the Damon's Assets, or served to accomplish an assignment or transfer of those assets to DNA following Unique's acquisition of them.

Thus, the Court is left with the question of whether the Assignment of Trademarks document executed by Sikirica on October 31, 2014, and its subsequent filing with the USPTO on November 10, 2014, effected an assignment of at least a portion of the Damon's Assets, i.e., the Damon's Trademarks, to DNA. In analyzing this issue the Court begins with the fundamental principle that:

> Trademark ownership may be assigned, but the assignor may transfer only what it owns.

*A & L Labs., Inc. v. Bou-Matic LLC*, 429 F.3d 775, 779 (8th Cir. 2005) (citing, J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:14 (4th ed.2004). Thus, if Sikirica did not own the Damon's Trademarks as of October 31, 2014, he could not have transferred ownership of them to DNA.

---

[7] Paragraph D of the September 27, 2013 Order provides that the Asset Purchase Agreement is "in full force and effect" and is "binding" on Unique.

The foregoing in turn then leads to the question of whether Sikirica had any ownership interest in the Damon's Trademarks that he could transfer to DNA following the June 27, 2014 sale to Unique. The Court finds that he did not. The Parties have not stated whether they believe state law or federal law should be applied in determining the effect of the June 27th transaction, but the Court finds that the conclusion is the same under either.

Under Pennsylvania law an assignment is "a transfer or setting over of property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole estate, chattel or other thing." *Seneca Ins. Co., Inc., v. Lexington and Concord Search and Abstract, LLC,* 484 F. Supp. 2d 374, 377 (E.D. Pa. 2007) (citations omitted). *See also, e.g., In re Dean*, 317 B.R. 482, 487 (Bankr. W.D. Pa. 2004) (under Pennsylvania law, unless an assignment is qualified in some way the assignor's property rights are extinguished and transferred to the assignee), *Legal Capital, LLC v. Medical Professional Liability Catastrophe Loss Fund*, 750 A.2d 299, 302 (Pa. 2000) (same), 3 *McCarthy on Trademarks and Unfair Competition* § 18:15 (5th ed. 2017).

There is no qualification in either the Bill of Sale or the Assignment and Assumption Agreement; in both documents Sikirica transferred "all of [his] right, title and interest" (emphasis added) in the Damon's Assets, including the trademarks, to Unique. The Court therefore concludes that under Pennsylvania law Sikirica's ownership rights in the Damon's Assets were extinguished following the June 27th transaction. Nothing occurred thereafter which restored any ownership rights to Sikirica, and therefore he had no ownership rights to assign to DNA when the October 31st Assignment of Trademarks was signed.

The same result is obtained if this issue is analyzed under federal law, which in this instance would mean the *Lanham Act, 15 U.S.C. §§1051, et seq.* That statute requires assignments of federally registered trademarks to be made by "instruments in writing duly executed." *15 U.S.C. §1060(a)(3).* The June 27th Bill of Sale and Assignment and Assumption Agreement documents satisfy those requirements. The fact that the June 27th documents were not recorded with the USPTO does not alter the conclusion that Sikirica had assigned all of his rights in the Damon's Trademarks to Unique. The *Lanham Act* includes the following provision:

> (4)    An assignment shall be void against any subsequent purchaser for valuable consideration without notice, unless the prescribed information reporting the assignment is recorded in the United States Patent and Trademark Office within 3 months after the date of the assignment or prior to the subsequent purchase.

*15 U.S.C. §1060(a)(4).* In other words, recordation with the USPTO is not mandatory, and the failure to record does not invalidate an assignment generally, but only as to certain parties, *viz.,* subsequent purchasers for valuable consideration without notice. *See, Teter, Inc. v. Rheem Manufacturing Company*, 334 F.2d 784, 786-87 (7th Cir. 1964). The failure to record the June 27th documents thus did not render the Sikirica to Unique assignment void as against the purported subsequent assignment from Sikirica to DNA because DNA was not a subsequent purchaser for valuable consideration without notice, and it was therefore not within the protective scope of the statute.[8]

---

[8]

It should also be pointed out that the November 10th recordation of the Assignment of Trademarks in the USPTO does not establish the validity of the purported assignment from Sikirica to DNA. The USPTO records such assignment documents merely as a ministerial act and does not conduct any investigation to determine whether the assignor actually owns the trademarks it is ostensibly assigning. *See,* 4 *Callmann on Unfair Competition, Trademarks and Monopolies* §20:49 (4th Ed. 2003).

Having found that the Damon's Trademarks were assigned to Unique on June 27, 2014, and never subsequently assigned from Unique to DNA, the Court concludes that those trademarks, along with the other Damon's Assets, are property of the Unique bankruptcy estate and Plaintiff is entitled to its requested relief.  This conclusion makes it unnecessary for the Court to consider the alternative theory advanced by Plaintiff based on alter ego, but for the sake of completeness the Court will briefly examine it as well.

The alternative theory raised by Plaintiff is that, even if the Court were to find that the Damon's Assets had been transferred to DNA, they should still be declared to be property of the Unique bankruptcy estate because DNA was nothing but the alter ego of Unique and a "complete sham as a separate company."  While recognizing that it has just found that no such transfer to DNA ever occurred, the Court will assume arguendo that a transfer to DNA was somehow effected and consider whether, even so, the Damon's Assets should be declared to be property of the Unique estate.

In support of its alter ego theory, the Plaintiff points out such things as M. Rusnock's testimony to the effect that he was only a "trustee" of  DNA acting for the benefit of the Unique board members who were the actual owners of DNA,[9] *Trial Transcript*, 32:14 - 33: 3, October 7, 2019 (Doc. No. 161), that despite being the sole member of DNA he did not have the authority to

---

[9]

Although the Plaintiff relies heavily on this testimony by M. Rusnock in support of its alter ego theory, the Court notes that he referred to being a trustee for the benefit of the Unique board members, *not* for the benefit of Unique.  Plaintiff's argument overlooks this potentially significant distinction.  When the Court raised this issue with Plaintiff's counsel at the final argument he had no persuasive response.

19

bind  DNA without the permission of the Unique board, *Id*. at 47: 8 - 24, and that DNA received funds from Unique that were then paid out to Unique members and for various expenses for the benefit of Unique and its board members, *id.* at 40: 8 - 25 and 58:22 - 60:17.  The Plaintiff also raised questions about the qualification of M. Rusnock to operate DNA and argued  that he was put in the position of being the sole owner of DNA mainly because the other Unique board members believed they could trust and control him to do their bidding, while keeping their fingerprints off the Damon's Assets and thereby avoiding any issues with PMC and its objection to Unique owning the Damon's Assets.

DNA counters by arguing that it is a legitimate and independent entity, not merely a sham.  DNA asserts  that it was properly created,  that it followed all required corporate formalities, and that it had its own separate office and operating account.  DNA denies that it was under the dominance or control of Unique and argues that it was created based on a fair business judgment.

Both sides have cited cases in support of their positions.  The Plaintiff relies on *In re Buildings by Jaime*, 230 B.R. 36 (D.N.J. 1998) for the proposition that a debtor's interest in its alter ego's assets are property of the bankruptcy estate, and it cites a number of cases under Pennsylvania law that stress the equitable and flexible nature of the determination whether to pierce the corporate veil of an alter ego, arguing that such may be done whenever fraud or injustice has been perpetrated by a sham corporate form.  DNA relies on *Lumax Industries, Inc. v. Aultman*, 669 A.2d. 893 (Pa. 1995) which stresses that under Pennsylvania law there is a strong presumption against piercing the corporate veil and sets forth a number of factors that must be considered in deciding whether to disregard a corporate form.

As an initial matter, even though neither side has raised the issue, the Court finds it necessary to consider whether the Plaintiff has the authority and standing to bring the alter ego claim. *11U.S.C. §541* defines the property of a bankruptcy estate. It has generally been held that a trustee or debtor in possession can bring an alter ego claim under *Section 541* when (1) such a claim would be common to all creditors and (2) the law of the applicable jurisdiction allows such a cause of action. *See, e.g., Hirschfield v. B'nai B'rith International*, 2010 WL 1156250 (W. D. Pa. August 10, 2010) (citing *In re Icarus Holdings, LLC*, 391 F.3d 1315, 1321 (11th Cir. 2004)). The first requirement is met in this case because any "recovery" made by the Plaintiff would increase the Unique bankruptcy estate to the benefit of the entire class of general unsecured creditors.

Whether the second requirement is met here is not as clear because the Court was not able to find a case from the Pennsylvania Supreme Court or the Third Circuit explicitly holding that under Pennsylvania law a corporation, or a bankruptcy trustee as its successor, has standing to bring an alter ego claim where the corporation cannot claim to be a creditor that was defrauded or deceived by the corporate fiction, or an involuntary tort creditor. Allowing such an action to be brought by the corporation or its bankruptcy trustee in these circumstances presents certain conceptual difficulties since a remedy of piercing the corporate veil is generally viewed as being designed to protect the interests of creditors, not to protect the rights of the corporation itself. As a result, there is a split in authority as to whether a bankruptcy trustee may pursue an alter ego claim under *Section 541. See, Raytheon Co. v. Boccard USA Corp.*, 369 SW2d 626, 636 (Tex. Ct. of Appeals 2012) (discussing split in authority and collecting cases). Nevertheless, the *Raytheon* court itself concluded that Pennsylvania would allow a bankruptcy trustee to bring such an action, and

21

other courts have reached that same conclusion.  *See, e.g., In re Jamuna Real Estate LLC*, 365 B.R.

540, 562 - 564 (Bankr. E.D. Pa. 2007) (quoting and relying on dicta in *Phar-Mor, Inc. v. Coopers*

*& Lybrand*, 22 F.3d 1228 (3d Cir. 1994)).  Without needing to actually decide the matter at this time,

the Court will therefore assume that the Plaintiff, as the successor to the Debtor and the bankruptcy

Trustee, does have  the authority and standing to bring the alter ego claim and proceed to consider

its merits.

       As to that, the Court finds that the most notable feature of the alter ego claim

presented here is that it does not seek the typical, "classic" remedy of piercing the veil of a

corporation so as to impress the debts of that corporation upon a controlling individual, but rather

that it seeks a "reverse" piercing whereby the corporate form of DNA would be disregarded so that

DNA's assets would be available to help pay the debts of Unique.   This is significant because the

same factors and considerations that would  apply in the typical veil-piercing scenario do not seem

to apply in a reverse piercing.

       The Court is particularly informed in that regard by *In re Blatstein*, 192 F.3d 88 (3d

Cir. 1999).  In that case Blatstein was a bankruptcy debtor who was sued in an adversary proceeding

in the bankruptcy by one of his creditors and bankruptcy trustees based on allegations that he had

transferred income and corporate shares to  related corporations that he controlled.  Among the relief

sought was bringing such assets back  into the bankruptcy estate under an alter ego, reverse piercing

theory.  The bankruptcy court found some factors weighed in favor of piercing the corporate veil,

for instance that the corporations had paid personal expenses of the debtor and made interest-free

loans to him.  It nonetheless refused to pierce the veil because it found corporate formalities had

22

been observed and because it found no proof that the corporations were in existence only to benefit

the debtor's private concerns, no evidence that the debtor had abused the corporate form for

illegitimate purposes,  no evidence that the corporations had committed fraudulent acts (with one

unrelated exception involving a fraudulent transfer), and no evidence that the debtor had siphoned

funds into or out of the corporations.

In *Blatstein* the district court affirmed the bankruptcy court's decision, and then the

Third Circuit likewise affirmed.  In so doing the court started out by noting Pennsylvania's strong

presumption against piercing the corporate veil.  192 F.3d at 100 (citing *Lumax, supra*).  The court

then went on to discuss that the remedy being sought in this case was not a "classical" piercing, but

rather a reverse piercing, and noted that only an "exceptional circumstance" can warrant the grant

of this "unusual" remedy.  *Id.*  The court summed up by stating:

> Consequently, a court should use its equitable powers to disregard the
> corporate form only if reverse piercing of the veil 'will prevent fraud,
> illegality, injustice, [or] a contravention of public policy...'

*Id.* (quoting *In re Mass*, 178 B.R. 626 (M.D. Pa. 1995)).  The bankruptcy court was found not to

have committed any error because "this case lacks an equitable justification for reverse piercing the

corporate veils."  *Id.* at 101.  *See also, e.g. Presidential Facility, LLC v. Campbell*, 2015 WL

1208261 (E.D. Pa. March 16, 2015) (even with requisite factual showing that debtor and non-debtor

entity are so closely intertwined so as to be essentially one economic being, court could only reverse

pierce to prevent fraud, illegality, injustice or a contravention of public policy, citing *Blatstein*)

When the Court considers the evidence presented in this case it finds nothing that demonstrates any fraud, illegality, injustice or contravention of public policy that would be avoided by disregarding the corporate veil of DNA. The Court made clear at the trial that it found no evidence of fraud as against creditors in connection with the creation of DNA, and no evidence that Unique was insolvent or in any imminent danger of insolvency at that time, which was why it rejected the fraudulent transfer claim. Instead, DNA was created solely as a means to avoid any difficulties with PMC that might otherwise flow from the acquisition of the Damon's Assets. The creation of DNA may have been an astute legal move (had the Damon's Assets actually been transferred to that entity), but it was not fraudulent, illegal, unjust, or in contravention of public policy. Furthermore, even though the actual operation of DNA did encompass some features that could be found to weigh in favor of piercing its veil, there were also countervailing features[10] and – most significantly – there was no evidence of fraud, illegality, injustice or violation of public policy in connection with its operation. Accordingly, if the Damon's Assets had been transferred to DNA at or about the time of its creation the Court would not have brought them into the bankruptcy estate based on the Plaintiff's alter ego, reverse piercing theory.

---

[10] For instance, DNA did have its own separate identity, its own separate office, and its own separate operating account. While Plaintiff highlighted the fact that DNA paid Unique members distributions and expenses from out of its account, the evidence indicated that this was done merely as a matter of convenience, and that Unique advanced the funds needed for such payments to DNA. In other words, DNA funds were not improperly used to benefit Unique. The question of outside power is also not something that would clearly point to piercing DNA's veil. While the Court is satisfied that M. Rusnock was subject to strong outside influence in running DNA that was not consistent with his status as the sole member of DNA, such influence did not come from Unique per se, but from its board members acting in their individual capacities. In short, even if the heightened standard to effect a reverse piercing were not present in this case, there is room for doubt whether Plaintiff could have met the lower threshold required in the more typical veil piercing scenario.

An appropriate order of declaratory judgment will be issued separately.

Dated:  January 22, 2020

_____
Thomas P. Agresti, Judge
United States Bankruptcy Court

Case administrator to serve:
     Ross M. Bobbitt, Esq.
     Joseph Luvara, Esq.

25